# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

DESMOND DEFREITAS,

                              Petitioner,

       v.                                    9:16-CV-638
                                                      (LEK/ATB)

MICHAEL KIRKPATRICK, Superintendent

                              Respondent.

DESMOND DEFREITAS, Petitioner, pro se
PAUL LYONS, DENNIS RAMBAUD, AAGs, for Respondent

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).

Petitioner, incarcerated at Clinton Correctional Facility, filed this petition, pursuant to 28 U.S.C. § 2254, challenging a judgment of conviction, dated September 28, 2009, after a Schoharie County Court jury found petitioner guilty of a one count of third degree criminal sexual act; two counts of third degree rape; second degree burglary; and two counts of endangering the welfare of the child.

On December 23, 2009, prior to sentencing, petitioner's attorney moved to set aside the guilty verdict pursuant to N.Y. Crim. Proc. Law § 330.30 on the ground that petitioner was denied the right to a public trial. (State Court Record ("SR") 1078-81). On January 25, 2010, the trial court judge denied petitioner's motion. (SR 1083-84). On February 3, 2010, petitioner was sentenced to consecutive determinate prison terms

of 4 years, followed by 10 years of post-release supervision for each of the third degree criminal sexual acts and third degree rape conviction. He was sentenced to a determinate term of 8 years, followed by 5 years post-release supervision on the second degree burglary charge and one year for each count of endangering the welfare of a child. The 8-year and 1-year sentences were to be served concurrently with each other and concurrently with the 4 year terms. (SR 10-12).

The Appellate Division, Third Department affirmed petitioner's convictions, but reduced petitioner's second degree burglary conviction to third degree burglary. *People v. DeFreitas*, 116 A.D.3d 1078 (3d Dep't 2014). The New York Court of Appeals denied leave to appeal on September 12, 2014. *People v. DeFreitas*, 24 N.Y.3d 960 (2014). Petitioner filed a pro se motion for a writ of error coram nobis in the Appellate Division, raising the ineffective assistance of appellate counsel. (SR 1126-87). The Appellate Division summarily denied his application on November 9, 2015, and the New York Court of Appeals denied leave to appeal on April 5, 2016. (Dkt. No. 6-3 at 9-10).

In his application, petitioner raises the following grounds for relief:

(1) Petitioner was denied his constitutional right to a public trial.

(2) The trial court improperly denied petitioner's challenges for cause with respect to three jurors.

(3) The prosecutor engaged in misconduct.

(4) The trial court improperly restricted petitioner's right to present a defense.

(5) Petitioner's appellate counsel was ineffective.

2

(Petition ("Pet.") ¶ 13 - Grounds One-Five) (Dkt. No. 1). Petitioner also filed a memorandum of law with his petition.[1]

Respondent has filed an answer to the petition, together with the pertinent state court records and a memorandum of law. (Dkt. Nos. 20-22). For the following reasons, this court agrees with respondent and will recommend denial of the petition.

## DISCUSSION

### I.  Relevant Facts

Respondent has set forth the relevant facts in his memorandum of law. The court will only summarize and supplement the facts as necessary for clarity and to discuss the grounds raised by the petitioner. Because this case involves sex-related crimes with an under-aged victim and the victim's siblings, the court will refer to the children by their initials or will refer to the "victim."

In October 2007, the fifteen-year-old victim ("AR") was living in a trailer park in Esperance with her mother, her step-father ("Larry"), her sixteen-year-old sister ("SR"), and her thirteen-year-old brother ("BR"). (AR: 534, 605).[2] They met petitioner at the County Office Building. (AR: 535). Petitioner told the family that he had an apartment for rent on the second floor of his building on Potter Mountain Road in Gilboa-

---

[1] These documents and the state court records accompanying respondent's papers have been sealed to protect the identity of minor children, both victims of the assault and witnesses who were not victims. To the extent that the court must refer to one of the minors, it will use the initials of the victim's name.

[2] When citing to an individual's testimony from the Trial Transcript, the court will cite to the original page number of the transcript found in the upper right hand corner of the page, together with the individual's name or initials in the case of the minor children. When citing to a portion of the trial transcript that does not contain testimony, the court will cite only to ("T").

Conesville. (AR: 535, 537). When the family was evicted from the trailer park,[3] they moved into the building owned by petitioner. However, because the upstairs apartment was not completed yet, the family moved in with petitioner, his wife, and his two children, who lived "downstairs." (AR: 537). Petitioner was a plumber, and AR testified that in October of 2007, she occasionally went on "plumbing jobs" with him.[4] Petitioner was also working on the upstairs apartment, so that AR's family could move in. (AR: 539-40).

One day in October of 2007, petitioner was working on the electrical system in the upstairs apartment, and AR was present. (AR: 540). AR testified that petitioner asked her to go to the other side of the apartment, where he started holding her hand. (*Id.*) AR asked petitioner why he was "doing this," and petitioner told her not to "worry about it." (*Id.*) They left the apartment, and went to petitioner's van, purportedly to get some tools for the job he was doing in the apartment. However, when they got to the van, petitioner asked AR to come into the van, and when AR questioned why petitioner was asking her to come into the van, petitioner told AR that he did not want her standing outside alone. (AR: 541). AR went into the van, and petitioner pulled down her pants "and licked between [her] labia." (*Id.*) AR testified that petitioner heard noises, she pulled her pants up, jumped out of the van, and started walking away. (AR: 542). Petitioner followed her and asked why she walked away, because "'it would have made it look too obvious.'" (*Id.*) AR told petitioner that she

---

[3] The family was having "water problems" at the trailer park. (AR: 655).

[4] On cross-examination, AR testified that sometimes, she, Larry, SR, BR, and petitioner would all go to petitioner's plumbing jobs together. (AR: 611).

did not "feel comfortable." (AR: 542).

AR then testified to various instances in which petitioner had sexual contact with her, including intercourse. (AR: 543-49). In one instance, petitioner asked AR and her sister to accompany him on a plumbing job at a house located on Kingsley Road. (AR: 543, SR: 808-809). The house was a seasonal residence owned by Toni Dickenson and Louis Munoz. (Munoz: 1250-53; Dickenson: 1045-46, 1052). Petitioner had done some plumbing work there the previous summer. (*Id.*) When petitioner, AR and SR arrived at the house, petitioner told SR to stay in the van as a "lookout,"[5] and he and AR entered the building through the unlocked back door. (AR: 544-45; SR: 802-809, 814). Once inside the house, petitioner had intercourse with AR in an upstairs bedroom, where he ejaculated onto the sheets of the bed. (AR: 546-49). Petitioner also took some kitchen cabinets from the house, which were later installed into the upstairs apartment that he was renovating for AR's family. (AR: 560; SR:814). AR testified to three additional instances in which petitioner had sexual contact with her. (AR: 562, 574-77, 578-80).

In December of 2007, Larry moved out of petitioner's apartment house after Larry was accused of sexually abusing AR.[6] (AR: 616, 624). Petitioner eventually

---

[5] AR testified that when they arrived at the house, petitioner told AR and her sister that they were going to "burglarize" the house. (AR: 544). SR was going to be the "lookout," and AR was going into the house with petitioner. (AR: 544; SR: 808).

[6] On cross-examination, AR testified that there were times when petitioner observed "something inappropriate between [AR] and Larry." (AR: 626-28). AR testified that petitioner was going to report that Larry was abusing AR. (AR: 630). SR testified on cross-examination that she was aware that petitioner "went down to the county office building . . . and filed a complaint [against Larry]." (SR: 908, 1009-10). The children were all interviewed by Child Protective Services regarding the complaint. (SR: 909). Part of the petitioner's theory at trial was that the children were upset

evicted AR's mother and the children. (AR: 580; DeFreitas: 3252-53). AR testified that in February of 2008, petitioner asked her to write him a letter saying that he never "did anything" to her or her family.[7] (AR: 581, 584, 591). Petitioner told AR that he needed the letter because his wife had consulted a psychic, who told her that petitioner was sexually abusing AR. (AR: 581-82). AR wrote the letter, even though she stated that it "was a lie."[8] (AR: 582).

New York State Police Investigator George Bird testified that he was contacted by Amy Wright, the supervisor of the Schoharie County Child Protective Services ("CPS"). (Bird: 1437). Ms. Wright told Investigator Bird that AR may have been subjected to sexual contact with petitioner. (*Id.*) Investigator Bird interviewed both AR and SR and then attempted to locate the seasonal residence that they described "as having been burglarized and in which a sexual assault took place." (Bird: 1440). The description was provided in "particular detail," and Investigator Bird testified that he knew what he was looking for. (Bird: 1441).

Investigator Bird began his investigation by looking for seasonal homes in the area. He also went to the full-time residences to ask questions. On September 1, 2008. he interviewed Toni Dickenson and Louis Munoz, who owned both a full-time residence and a seasonal residence in the area. (Bird: 1442-43). When Investigator Bird

---

because petitioner's complaint caused Larry's removal from the home, and the children vowed to "get even" with petitioner and his wife. (*See* SR: 911-12) (cross-examination).

[7] Petitioner denied asking AR to write the letter. (DeFreitas: 3254).

[8] When asked why she wrote the letter even though she knew it was a lie, AR said that she "was manipulated," and she "didn't know what to do." (AR: 583).

questioned Ms. Dickenson and Mr. Munoz, they told him that their seasonal residence had been burglarized, and that kitchen cabinets had been stolen. (Bird: 1443). They told Investigator Bird that they had not reported the burglary because they "held out little hope that it would ever be solved," but they offered to show Investigator Bird the premises and signed a voluntary consent to search. (Bird: 1444-45).

Upon entering the house on September 1, 2008, Inspector Bird went to the kitchen area from which the cabinets were stolen and then proceeded upstairs where the bunk beds were located. (Bird: 1447). Investigator Bird testified that "looking at the bunkbeds, it was much like the information that was provided to me . . . during the interview of [AR and SR], specifically . . . [AR]."[9] (Bird: 1447). Investigator Bird then collected evidence from the lower bunk by placing the items in paper bags. (Bird: 1451-52). The sheets and other bedding were then submitted for DNA testing. (Bird: 1452-53).

Investigator Bird received a serology report indicating that sperm had been found on the sheets that he recovered from the Munoz/Dickenson premises. (Bird: 1489-90; Forensic DNA Serologist Andrea Allard: 1718-42). After petitioner was arrested in early September of 2008, a DNA sample was obtained from him pursuant to a court order on December 3, 2008. (Bird: 1491). AR also provided a DNA sample. (*Id.*) Forensic Scientist Jay Caponera of the New York State Police Forensic Investigation Center testified that the DNA analysis revealed that the semen on the sheets belonged

_____

[9] Investigator Bird had interviewed AR and SR on August 29, 2008. (Bird: 1448). Based on that interview, Investigator Bird believed that "there was a likelihood that there could be DNA evidence found on that lower bunk." (Bird: 1448).

to petitioner, and that AR's DNA was also present on one of the sheets. (Caponera: 1932-33, 1977-79, 1982-83). On January 6, 2009, Investigator Bird obtained a search warrant for petitioner's van, and in it he found a copy of the letter that AR wrote at petitioner's request. (Bird: 1525-31).

Petitioner testified on his own behalf. He testified that in 2006, he did some plumbing work at 409 Kingsley Road at Ms. Dickerson's request. (D. DeFreitas: 2997-3000, 3188, 3284-85). In September of 2007, Mr. Munoz hired petitioner to do plumbing work at their other house they owned - 306 Kingsley Road. (D. DeFreitas: 2999-3000). Mr. Munoz provided petitioner with a key when he worked at 409 Kingsley Road, which he returned to Mr. Munoz after the job was done. (D. DeFreitas: (*Id.*) When he worked at 306 Kingsley Road, the door was always open because there were no keys to the front door. (D. DeFreitas: 3003).

Petitioner explained how he met AR's family at the Schoharie County Office Building while they were there complaining about their water being shut off by their landlord at the trailer park. (D. DeFreitas: 3018-19). Because AR's family did not have the money to hire a plumber, petitioner told them that he would "look at it for free," and that if there was anything that needed to be done, he would do it for free. (D. DeFreitas: 3019). Petitioner and Larry went back to the trailer park alone, leaving the rest of their families at the County Office Building. Petitioner testified that by the time he and Larry arrived at the trailer park, the water was back on, and there was nothing wrong with the service. When they went back to the County Office Building to pick up their respective families, petitioner gave Larry his card, and told him to call if he had any

more plumbing problems. (D. DeFreitas: 3020).

Petitioner testified that Larry and his family continued to have trouble with the water and the landlord at the trailer park. One day when petitioner got home from a job, Larry and his wife were sitting at petitioner's kitchen table, and they informed petitioner that "um, we are moving in." (D. DeFreitas: 3022). However, because the upstairs apartment was not ready yet, Larry and his family stayed in the DeFreitas's apartment from October 4, 2007 until they moved into the upstairs apartment on October 18, 2007. (D. DeFreitas: 3018-23, 3023, 3036-38).

Petitioner also testified that Larry and his children accompanied petitioner on some plumbing jobs, one in particular on October 20, 2007, at the home of James Presley. (D. DeFreitas: 3031-33). Larry gave petitioner a ride, and AR, SR, and BR came along. (D. DeFreitas: 3033). Larry gave petitioner a ride to approximately ten to fifteen jobs and to other destinations between November and December of 2007 because petitioner was having trouble with his van. (D. DeFreitas: 3066-69, 3072, 3211). One or more of the children often accompanied the two men. (DeFreitas: 3033, 3068, 3080).

Petitioner denied ever performing sexual activities with AR at 306 Kingsley Road. (D. DeFreitas: 3091). In addition, although there were photographs of petitioner asleep on the furniture in the upstairs apartment in the building he owned at 699 Potter Avenue, petitioner denied ever performing sexual acts with AR on the couch in that upstairs apartment. (D. DeFreitas: 3095-98). However, petitioner testified that in December of 2007, he observed AR laying in Larry's lap, and other inappropriate

9

behaviors between Larry and AR. (D. DeFreitas: 3107-3109). Petitioner testified that he confronted AR's mother with this information, and she "broke down crying [and] told me what was going on." (D. DeFreitas: 3110).

Petitioner told AR's mother that he was going to file a complaint against Larry, and that she could "either come with [him] or they [would] come for [her]." (D. DeFreitas: 3110). As a result, petitioner and AR's mother both went to Schoharie to file a complaint against Larry. (*Id.*) Investigator Bird interviewed petitioner regarding the complaint against Larry. (D. DeFreitas: 3111). Later that evening, two New York State Troopers escorted Larry back to the house to pick up some of his belongings. (D. DeFreitas: 3114). Petitioner testified that the "girls" were upset and crying when they saw Larry in the company of the police and were "pissed off" at petitioner's wife because they believed that she filed the complaint against Larry. (D. DeFreitas: 3115). Petitioner testified that the girls were calling his wife names and breaking things in the apartment. (*Id.*)

Petitioner testified that somewhere in between December 12 and Christmas time, Investigator Bird came to petitioner's home to tell him that Larry maintained "it wasn't him," it was petitioner who molested Larry's daughters. (D. DeFreitas: 3121-23). Petitioner stated that Investigator Bird requested that petitioner provide a sperm sample "to clear [his] name." (D. DeFreitas: 3123). Petitioner testified that he complied with the Investigator's request. (D. DeFreitas: 3123-25). Petitioner denied having sex with AR on the couch. (D. DeFreitas: 3095). He testified that he only slept upstairs overnight on one occasion, and that his whole family was with him at that time. (D.

DeFreitas: 3107, 3213 (cross)).

Petitioner's wife testified that on October 3, 2008, Larry and his wife showed up at the DeFreitas home "claiming they were homeless." (C. DeFreitas: 2482). Ms. DeFreitas "being a mother," told Larry and his wife that they could stay in her house "until they got on their feet." (C. DeFreitas: 2483). They stayed with the DeFreitas family for a few weeks, until Ms. DeFreitas sister came to visit from New York City. (C. DeFreitas: 2491). Ms. DeFreitas told Larry that he and his family were going to have to move upstairs. (*Id.*) Larry and his family moved into the unfinished apartment upstairs, but Ms. DeFreitas testified that the move was only going to be temporary "until they got back on their feet." (*Id.*)

Ms. DeFreitas testified to one particular instance where she thought Larry's behavior toward his daughter AR and AR's response were "weird." (C. DeFreitas: 2502). She testified that on December 12, 2007,[10] petitioner and Larry's wife went down to Schoharie County to "make a report against Larry . . . ." (C. DeFreitas: 2517). Ms. DeFreitas testified that the day that her husband and Larry's wife went to file a complaint against Larry, he went to pick AR up at school. (C. DeFreitas: 2518). Ms. DeFreitas stated that when Larry and AR got home, they went upstairs, and from her kitchen, she could hear that they were moaning as if they were having sex in the bathroom upstairs. (C. DeFreitas: 2519-20). On cross-examination, Ms. DeFreitas testified that she never complained to anyone about this incident. (C. DeFreitas: 2592).

---

[10] It appears that Ms. DeFreitas was referring to December 12, 2007 because several pages earlier, defense counsel asked her about incidents that happened at Thanksgiving of 2007. (C. DeFreitas: 2514).

Ms. DeFreitas also testified that after Larry was arrested, the girls started throwing things around and calling her names. (C. DeFreitas: 2521-22). She heard the children say that "Connie" was going to "pay for this for taking their daddy away." (C. DeFreitas: 2521). Shortly thereafter, Ms. DeFreitas got a telephone call from AR's mother telling her that AR ran downstairs with a knife to "stab" Connie, but BR had stopped her. (C. DeFreitas: 2522-23). Ms. DeFreitas testified that she observed "this" from her kitchen window. (C. DeFreitas: 2523).

Ms. DeFreitas also testified that on December 23, 2007, Investigator Bird came to their home and told petitioner that Larry made allegations about petitioner having sex with AR and SR, and that the police needed a sperm sample "to clear [petitioner's] name." (C. DeFreitas: 2546-48). Ms. DeFreitas stated that she did not trust Investigator Bird and told petitioner not to "do it," but petitioner stated that he had "nothing to hide" and provided Investigator Bird with the sample. (C. DeFreitas: 2549). "Ten months later, [petitioner] got arrested."[11] (*Id.*)

The jury also heard testimony from petitioner's son. Petitioner's son testified that he slept in the apartment upstairs a few times while AR and her family lived there. (CD: 2439-40). On one occasion, his whole family slept up there, but CD was not

---

[11] Petitioner's wife signed an affidavit in which she alleged that Investigator Bird planted the evidence against petitioner. (T. 3602-3603). Ms. DeFreitas acknowledged that she wrote a letter prior to signing the affidavit, in which she discussed the allegations against petitioner, but never mentioned that the petitioner provided a sperm sample that she told him not to give. The subsequent affidavit, prepared by petitioner's attorney months later, stated that Investigator Bird had visited her home and obtained a sperm sample from petitioner on December 23, 2007. (T. 3605-3606; C. DeFreitas: 3609-19, 3621-28). When Ms. DeFreitas was questioned about the affidavit, she testified that her husband's attorney prepared it. (C. DeFreitas: 3623). In addition, the affidavit was written on December 3, 2008, after the September 12, 2008 serology report finding that the petitioner's DNA was found on the sheets. (C. DeFreitas: 3625-26).

aware of any occasion when petitioner slept upstairs without the rest of the family, and CD never saw petitioner hold hands with, or kiss, AR. (CD: 2448-50).

Margaret Yetman and her daughter Dorothy testified that petitioner slept at their home in Middleburgh, New York on November 19, 2007, and that he drove Margaret to Schenectady for surgery on November 20, 2007. (D. Yetman: 2209-20; Margaret Yetman: 2244-47). There was a discussion with counsel and the court regarding the relevance of this testimony, but the court allowed it as it related to a possible "alibi." (T. 2210-18). In addition, the parties and the court discussed the admissibility of testimony about an interview that Dorothy Yetman had with Investigator Bird. (T. 2202-2203). After cross-examination, defense counsel argued that the prosecutor "opened the door" to testimony about the interview, in which Investigator Bird allegedly pounded the table and told DorothyYetman that he "knew" petitioner had raped her and warned her that she could have AIDS or be pregnant. (D. Yetman: 2228-29; Bird: 1646-47 - cross-examination). The court did not allow defense counsel to inquire further, after a lengthy argument over the issue. (T. 2228-41). Dorothy Yetman was allowed to testify that petitioner never came into her room in the middle of the night, laid a hand on her, or pressured her to "do" anything. (D. Yetman: 2241-42).

Margaret Yetman testified that she never had a problem with petitioner, and no one in her family ever reported anything "inappropriate." (M. Yetman: 2248). Ms. Yetman attempted to discuss the interview of her daughter by Investigator Bird, but counsel objected, and the court stopped the questioning. (M. Yetman: 2248-49).

A physician's assistant testified that she examined petitioner, and he had some

distinguishing marks on his genital area. (Murrock: 2923-36). A former neighbor of AR's family testified that, based on discussions with other residents of the trailer park where AR's family lived prior to moving into petitioner's building, she formed an opinion that AR and her siblings would "lie to protect one another." (Bouck: 3530-37, 3538).

Julie Pizziketti, the Assistant Director of the Biological Sciences Section of the New York State Forensic Investigation Center testified for the defendant. She stated that she spoke to Investigator Bird prior to testing the "large number of bedding items" that were submitted for testing in order to determine whether there were some items that were more likely to have biological material on them. (Pizziketti: 2371, 2376, 2381). Investigator Bird told her that the bottom and top sheets were most likely to contain biological samples.[12] (Pizziketti: 2382).

The prosecutor presented a rebuttal case. Both petitioner's wife and Investigator Bird were called to testify. Investigator Bird denied allegations that he "planted" the biological material on the sheets in question. (Bird: 3630). Investigator Bird was questioned about his visit to petitioner's building at 669 Potter Mountain Road. (Bird: 3631-32). Investigator Bird testified that the only time that he went to that address was on December 5, 2007, when he went to the upstairs apartment with a Schoharie County CPS worker, on a matter unrelated to petitioner or Larry. (Bird: 3631-32).

Investigator Bird did not receive the complaint about Larry until December 12,

---

[12] Petitioner's theory was that Investigator Bird "planted" the evidence on the sheets after mixing AR's DNA sample with petitioner's sample, and that is why he would have known where the biological material would "most likely" be located. It is possible that petitioner hoped that this testimony would put doubt in the jury's mind regarding his guilt.

2007, when petitioner and Larry's wife went to the CPS Office to file the complaint against Larry. (*Id.*) Investigator Bird went to the CPS Office and interviewed petitioner and Larry's wife and obtained written depositions regarding their complaint. (Bird: 3632). Petitioner was not a suspect at the time. (*Id.*) Larry was later arrested and released, and an order of protection issued, prohibiting him from being near the children. (Bird: 3633-34). The children were interviewed and made serious allegations against Larry. (Bird: 3634). Larry was later arrested on the more serious sex-related charges. (Bird: 3637). When Investigator Bird questioned Larry regarding these allegations, Larry did not make any admissions, but also did not implicate or make a claim against anyone else relative to his children. (Bird: 3634-35). Investigator Bird ultimately obtained DNA evidence in Larry's case pursuant to a search warrant for the family's former residence at the trailer park, based on information obtained from the children. (Bird: 3638-39).

Investigator Bird testified that he never requested or obtained a sperm sample from petitioner in 2007, nor did he visit petitioner's home between the date of Larry's arrest and December 23, 2007, when petitioner's wife testified that Investigator Bird came to their home and collected the sample. (Bird: 3637, 3641, 3650, 3655, 3657, 3665-66). Investigator Bird testified in great detail about his whereabouts and activities between December 18 and December 23, 2007. (Bird: 3640-41, 3649-50, 3650-51, 3656-57, 3665-66). Investigator Bird testified that no sample was ever taken from petitioner relative to Larry's case. (Bird: 3643). For petitioner's case, Investigator Bird

took buccal swabs on December 3, 2008 from petitioner[13] and the children, approximately one year after Larry's samples were taken. (Bird: 3648). Petitioner did not become a suspect in this case until August of 2008, when AR disclosed that she had participated in a burglary in November of 2007. (Bird: 3667, 3729-30). Investigator Bird specifically denied obtaining petitioner's semen and tampering with AR's DNA by putting a mixture of the two on the flat sheets that were recovered from the burglarized premises. (Bird: 3667-68).

After hearing all the evidence, on September 28, 2009, the jury found petitioner guilty of one count of third degree criminal sexual act and one count of endangering the welfare of a child based upon petitioner having engaged in oral sexual conduct with AR and masturbating in front of her in October of 2007; one count of third degree rape, one count of second degree burglary,[14] and one count of endangering the welfare of a child, based upon petitioner's unlawful entry into 306 Kingsley Road, engaging in sexual intercourse with AR in the house while having SR act as the lookout on October 22, 2007; and one count of third degree rape based on sexual intercourse with AR on November 22, 2007 inside the petitioner's house at 699 Potter Mountain Road. (T. 4138-41). The jury acquitted petitioner of the remaining counts. (*Id.*)

## II. Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

The AEDPA provides that, when a state court has adjudicated the **merits** of a

---

[13] The samples from petitioner were also taken pursuant to a court order. (Bird: 3648).

[14] As stated above, the second degree burglary was reduced to third degree burglary by the Appellate Division based upon the People's failure to prove that the dwelling to which petitioner gained entry was a dwelling. 116 A.D.3d at 1082-84.

petitioner's constitutional claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also, e.g.*, *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001); *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008). This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted).

To determine whether a state-court decision is contrary to clearly established Supreme Court precedent, the federal court must consider whether the state court decision "'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Id*. at 182 (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)) (alterations in original). A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle, but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. *See Williams*, 529 U.S. at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of

review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001). Finally, the Supreme Court has held that circuit and district court decisions do not constitute "clearly established Federal Law, as determined by the Supreme Court. *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012). Instead, circuit court decisions may illustrate the "possibility" of fairminded disagreement, sufficient to justify denying the writ. *White v. Woodall*, __ U.S. __, 134 S. Ct. 1697, 1703 n.3 (2014).

In this case, petitioner presented all of his claims such as to alert the court to the federal constitutional nature of his claims, and the state courts decided all of petitioner's claims on the merits. Thus, the AEDPA standard applies, and the court may proceed to consider the merits of the grounds upon which petitioner challenges his state court conviction.

## III.   Public Trial

### A.   Legal Standards

The Sixth Amendment to the United States Constitution by way of the Fourteenth Amendment guarantees a state criminal defendant "'the right to a speedy and public trial.'" *Moss v. Colvin*, 845 F.3d 516, 520 (2d Cir. 2017) (quoting U.S. Const. amend. VI). However, the right to a public trial is not absolute and may "'give way in certain cases to other rights or interests.'" *Id.* (quoting *Waller v. Georgia*, 467 U.S. 39, 45 (1984)). In the rare cases during which closure is appropriate, "'the balance of interests must be struck with special care.'" *Id.* In determining whether closure of the courtroom is justified, courts consider the following four-part test, articulated in *Waller*: (1) the

party seeking to close the hearing must present an "overriding interest" that is likely to be prejudiced if the courtroom is not closed; (2) the closure must be no broader than is necessary to protect that overriding interest; (3) the court must consider reasonable alternatives to closure; and (4) the court must make findings that are sufficient to support closure. *Id.* (citing *Waller*, 467 U.S. at 48; *Priestly v. Georgia*, 558 U.S. 209 (2010) (per curiam)). Reasonable alternatives must be considered even if the parties do not offer such alternatives, and the court must "take every reasonable measure to accommodate public attendance at criminal trials." *Id.* (quoting *Presley*, 558 U.S. at 214-15).

### B.    Application

In this case, the trial judge did not close the courtroom. Petitioner claims that an attorney, unrelated to petitioner or his case, was delayed when he attempted to get in to the courtroom to watch part of the petitioner's trial proceedings. The facts are not contested, and the attorney was ultimately able to enter, watched the trial for a short period of time, and left. Petitioner raised his claim on appeal, and the Appellate Division stated that "[a]ssuming this argument has been adequately preserved for our review, we disagree." 116 A.D.3d at 1079.

The court cited New York law, holding that the denial of a public trial requires "'an affirmative act by the trial court excluding persons from the courtroom, which in effect overcomes the presumption of openness.'" *Id.* (quoting *People v Peterson*, 81 N.Y.2d 824, 825 (1993) (other citations omitted)). The court stated that in petitioner's case, it was "undisputed" that the County Court judge did not close the courtroom, and

that the attorney in question, who had nothing to do with petitioner or his case, was allowed to enter the courtroom and observe the proceedings. *Id.* (citation omitted). The court also held that petitioner's "entirely speculative assertion" that some unidentified members of the public must also have been excluded from the proceedings, was not supported by the record. *Id.* The court specifically found that petitioner's Sixth Amendment right to a public trial was not violated. *Id.*

In this habeas application, petitioner continues to argue that if the attorney was delayed entry, and there were not many other people who entered the courtroom to observe the proceedings, then other members of the public must have also been "excluded." However, petitioner's allegations continue to be pure speculation. As respondent points out, in *Peterson v. Williams*, the Second Circuit found no Sixth Amendment violation when the trial courtroom remained closed in error for a short period after a proper closure order by the court had expired. *Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996). In making this determination, the Second Circuit cited *Snyder v. Coiner*, 365 F. Supp. 321 (N.D. W. Va. 1973), *aff'd*, 510 F.2d 224 (4th Cir. 1975), in which the court found no Sixth Amendment violation when a deputy sheriff closed the courtroom in error because he misunderstood the state trial judge's order to keep the courtroom quiet. *Peterson*, 85 F.3d at 42-43 (citing *Snyder, supra*). In *Snyder*, the Fourth Circuit affirmed the district court, holding that the closure was for a small portion of the trial, and neither the judge, nor the parties were aware of any exclusion of the public. *Id.* The Fourth Circuit stated that the incident was "'entirely too trivial to amount to a constitutional deprivation.'" *Peterson*, 85 F.3d at 43 (quoting *Snyder*, 510

F.2d at 230).

As stated above, the trial judge in this case did not order the courtroom "closed," and even assuming that the delay allegedly experienced by the attorney in question could be interpreted as a brief "closure," the *Waller* factors do not apply because those factors only apply when there has been decision by the court to close the courtroom. This case is more akin to *Peterson*.

In *Peterson*, the court examined the "values" furthered by the public trial guarantee and considered those factors in making the determination that no constitutional right had been violated. *Peterson*, 85 F.3d at 43 (citing *Waller*, 467 U.S.at 46-47). Those factors include: (1) ensuring a fair trial; (2) reminding the prosecutor and the judge of their responsibility to the defendant and the importance of their functions; (3) encouraging witnesses to come forward; and (4) discouraging perjury. *Id.* In *Peterson*, the court stated that it was only holding that "in the context of [that] case, where the closure was 1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent, the defendant's Sixth Amendment rights were not breached." *Id.* at 44. The court made it clear that it was not creating a general rule in every case that a brief or inadvertent closure, together with curative action by the court would, in itself, always be proper. *Id.*

The Appellate Division in this case cited the state court decision in *Peterson* as a basis for its finding that no Sixth Amendment violation occurred. 116 A.D.2d at 1079 (citing *People v. Peterson*, 81 N.Y.2d 824, 825 (1993)).[15] The state court in *Peterson*

---

[15] After the New York Court of Appeals affirmed Peterson's criminal case, he brought a petition for habeas corpus, which was denied on October 18, 1995. *Peterson v. Williams*, 901 F. Supp. 119

also cited *Waller* and the "values" furthered by the public trial guarantee in concluding that reversal in that case was not warranted because the closure was completely inadvertent, and "no evidence was offered that any observer wishing to enter was excluded." *People v. Peterson*, 186 A.D.2d 231, 232 (2d Dep't 1992).

The attorney in this petitioner's case was not "excluded." His entry into the courtroom was inadvertently delayed for some reason that was not articulated by any of the courts below.[16] A review of the factors articulated in *Peterson* lead the court to the same conclusion. The Appellate Division in this case did not act contrary to well-established Supreme Court precedent in holding that petitioner's Sixth Amendment rights were not violated. There is no basis for finding that the short delay in allowing the attorney to enter affected the fairness of petitioner's trial. The attorney in question was not related to petitioner or his case and was ultimately able to observe the proceeding that he wished to see. The delay did not pose the risk of an unreliable outcome. The delay was very short, and petitioner's trial lasted for four weeks. No one

---

(E.D.N.Y. 1995). Mr. Peterson appealed the denial of his federal application for habeas relief, and the Second Circuit affirmed in *Peterson v. Willaims*, 85 F.3d 39 (2d Cir. 1996).

[16] In petitioner's traverse, he states that the respondent has made an error by stating that petitioner did not know of the closure and he was the only one to have testified during that portion of the trial. (Pet. Trav. at 1) (Dkt. No. 25). Petitioner maintains that other people testified on the day that the attorney was delayed entry. (*Id*.) This court would point out that petitioner misread respondent's papers. Respondent was quoting from *Peterson* in a parenthetical. To the extent that it makes a difference, respondent was not claiming that petitioner was the only person who testified on the day in question. *See* Resp. Br. at 24 (citing *Peterson*, 85 F.3d at 43 ("[S]ince the defendant did not know of the closure and he was the only one to have testified during it, the closure was most unlikely to have encouraged perjury.") Petitioner also states that the attorney was denied access "multiple times" on the day in question. There is absolutely no indication from the papers or the Appellate Division's decision that the attorney was denied access "multiple times" during the day. Petitioner's attempt to inject new allegations in his reply is unavailing.

apparently was aware that the delay occurred, thus, there is no indication that the delay would have discouraged witnesses to appear or that the delay would have encouraged perjury. Finally, there is no evidence that any other individual was either delayed or excluded, regardless of petitioner's continued speculation. Petitioner's first ground may be dismissed.

## III. <u>For-Cause Jury Challenges</u>

### A. **Legal Standards**

It is well-settled that the Sixth and Fourteenth Amendments guarantee a defendant the right to an impartial jury. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). In *Ross*, the Court held that the fact that the defendant was required to use a peremptory challenge to remove a juror who he claimed should have been removed for cause did not violate the defendant's constitutional rights as long as the jurors who ultimately comprised the jury were impartial. *Id.* The Court "rejected the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Id.* It has long been recognized that "peremptory challenges are not of constitutional dimension." *Id.* (citations omitted). Peremptory challenges are only a "means" to achieve an impartial jury. *Id.* The court stated that any claim that the jury was not impartial would have to rest on the jurors that ultimately heard the case. *Id.*

### B. **Application**

In the relevant portion of *Ross*,[17] as in this case, petitioner did not challenge the

---

[17] At the close of jury selection in *Ross*, petitioner did claim that the jury was not impartial, but that claim was a separate claim, based upon the exclusion of blacks from the jury panel, and was not

jury itself, only the failure to remove three jurors for cause. *Id.* In this case, petitioner's counsel used peremptory challenges to remove the jurors who he believed should have been removed for cause. Peremptory challenges were used for Juror Nos. 1, 5, 7, 10, 14, and on appeal, petitioner challenged only the failure to excuse Jurors 5, 10, and 14 for cause, even though at trial he argued that all five of the jurors should have been excused for cause. 116 A.D.3d at 1079-80. None of the "objectionable" jurors sat for the trial. (T. 210).

Because petitioner never challenged the fairness of the jury which ultimately heard his case, the Appellate Division focused on whether the trial court's refusal to excuse the three jurors for cause was correct under New York law. 116 A.D.3d at 1079-80 (citing inter alia N.Y. Crim. Proc. Law § 270.20(1)(b), (c)). Thus, to the extent that petitioner is simply challenging the trial court's denial of the "for cause" challenges to the three jurors, there is no constitutional basis for his claim. The Appellate Division rejected petitioner's argument that the "challenged relationships" between two of the prospective jurors and the prosecution were "particularly close" and determined that the contact "arose in a professional context."[18] 116 A.D.3d at 1080. One of the potential jurors also had a scheduling conflict, but after discussing the time frame involved, she

---

related to the alleged failure to remove a juror for cause. 487 U.S. at 86.

[18] The Assistant District Attorney represented one of the juror's sons-in-law a couple of years earlier, and the juror knew the ADA by sight, but not personally. (T. 86, 146). The juror also stated that she knew two other members of the prosecution team, but that this would not affect her ability to be impartial. Another juror went to high school with one of the prosecution team and was "friends" with another, but also testified that she could be impartial.

stated that she would be fine.[19] (T. 209-210). Finally, the third juror had seen an account of the case in a newspaper. (T. 94, 114, 190). She was questioned closely regarding whether she could put aside what she had seen in the media, and assured the court that she could. (T. 190-91). The judge denied the challenge for cause based on the juror's statements. (T. 209).

Because the Appellate Division based its decision on the challenges themselves, and petitioner did not challenge the fairness of the jury that heard his case, the Appellate Division did not act contrary to, or unreasonably apply, clearly established Federal law, as determined by the Supreme Court of the United States. *See Forino v. Lee*, No. 10-CV-5980, 2016 WL 7350583, at *5 (E.D.N.Y. Dec. 19, 2016). The court in *Forino* addressed an almost identical issue. *Id.* In *Forino* the petitioner also argued that the trial judge improperly denied several "for cause" challenges, and the petitioner was forced to use peremptory challenges to remove the jurors. *Id.*

The Appellate Division in *Forino* found that the trial court's denial of all the "for cause" challenges was proper, and that none of the responses by the potential jurors rose to the level of actual bias. *Id.* In *Forino*, one of the challenged jurors was seated because petitioner had used all his peremptories. Thus, the Appellate Division considered whether the jury itself was impartial, but held that there was no evidence that the trial court "allowed the empanelment of a biased juror." *Id.* Petitioner had offered no evidence to the contrary, and the court dismissed the claim because "there

---

[19] The initial discussion was not on the record. (T. 206-207). Petitioner's counsel mentioned it when he was asked about challenges for cause. (*Id.*) The judge's ruling, denying the challenge for cause is on the record at (T. 209-210).

[was] no evidence that the trial court allowed the empanelment of a biased juror and the loss of a peremptory challenge does not violate a constitutional right." *Id.* (citing *United States v. Martinez Salazar*, 526 U.S. 304, 316 (2000); *Rivera v. Illinois*, 556 U.S. 148, 151 (2009)). *See also Donahue v. Griffin*, No. 12-CV-752, 2016 WL 5404584, at *7-8 (W.D.N.Y. Sept. 28, 2016) (peremptory challenges were not of constitutional dimension, allegedly biased juror did not serve on the jury, and no claim that jury that heard the case was not impartial). The same is true in this case, particularly because none of the challenged jurors were seated, and petitioner's "for cause" challenge claim should be dismissed.

## IV. Prosecutorial Misconduct

### A. Legal Standards

A claim of prosecutorial misconduct warrants habeas corpus relief only where the prosecutor's remarks so infected the trial with unfairness that the resulting conviction is a denial of due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Jackson v. Conway*, 763 F.3d 115, 144 (2d Cir. 2014) (quoting *Darden*, 477 U.S. at 180) (internal quotations omitted)). The habeas court must distinguish between "'ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amounting to a denial of constitutional due process.'" *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).

### 1. Comments

In order to show a constitutional violation, the petitioner must demonstrate that the prosecutor's comments "had a substantial and injurious effect or influence on

determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994). Habeas relief is not appropriate when there is merely a "'reasonable possibility'" that trial error contributed to the verdict. *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993). Three factors are considered in determining whether a prosecutor's summation met this standard: the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements. *Id.* (citing *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991)). *See also Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

## 2. *Brady Material*

The prosecutor in a criminal case has a constitutional obligation to disclose material, exculpatory evidence to a defendant. *Brady v. Maryland,* 373 U.S. 83 (1962). Pursuant to *Brady*, the prosecutor must disclose favorable evidence to the accused "where such evidence is 'material' either to guilt or punishment.'" *United States v. Cacace*, 796 F.3d 176, 183 (2d Cir. 2015) (quoting *United States v. Coppa*, 276 F.3d 132, 139 (2d Cir. 2011)). The good faith or bad faith of the prosecution is not relevant. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). A *Brady* violation occurs when (1) the prosecutor failed to disclose favorable evidence; and (2) the undisclosed evidence was "material." *United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996). Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Fuentes v. Griffin*, 829 F.3d 233, 246 (2d Cir. 2016) (quoting *U.S. v. Bagley*, 473 U.S. 667, 682 (1985)). A "reasonable probability" of a different result occurs when the nondisclosure

"'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. at 434). *See Banks v. Dretke*, 540 U.S. 668, 698 (2004) (materiality standard is met when the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict).

## B. Application

In this case, petitioner raised his prosecutorial misconduct claims on direct appeal, and the Appellate Division denied them summarily. 116 A.D.3d at 1084 ("Defendant's remaining contentions, to the extent not specifically addressed, have been examined and found to be lacking in merit.")  Notwithstanding the summary nature of the Appellate Division's decision, it must be accorded AEDPA deference. *Smith v. Artus*, 610 F. App'x 23, 26 n.1 (2d Cir. 2015) (quoting *Johnson v. Williams*, __ U.S. __, 133 S. Ct. 1088, 1096 (2013)). *See also Harrington v. Richter*, 562 U.S. 86, 99-100 (2011) (28 U.S.C. § 2254(d) does not require a state court to give reasons before its decision can be deemed to to have been 'adjudicated on the merits'" for purposes of AEDPA deference).

Because the Appellate Division denied petitioner's prosecutorial misconduct claims summarily, the court must turn to petitioner's appellate brief to determine what prosecutorial misconduct claims petitioner raised on appeal.  Petitioner first alleged that the prosecutor made improper comments during summation and during the trial itself. Petitioner claimed that when defense counsel moved to introduce an affidavit from petitioner's wife, on voir dire, the prosecutor "indicated to the jury" that he did not believe her, because he stated that there was "obviously inaccurate information" in her

affidavit. Defense counsel moved to strike the comment, the court stated that the prosecutor was "going beyond voir dire," and the court admitted the affidavit. However, petitioner complains that the court did not give a curative instruction to the jury, explaining the "impropriety of the prosecutor's comment." (SR 92).

Petitioner also claimed that the prosecutor made several "improper comments" during summation. Petitioner argued that the prosecutor referred to matters "not in evidence," when he stated that the petitioner was "grooming the children to commit unspeakable acts." (SR 93). Petitioner claimed that the prosecutor "vouched" for his witnesses, stating that their testimony was "more in line" with common sense, and referring to the victims of the burglary as honest, hardworking people. Petitioner also argued that the prosecutor "acted as if he were an expert," when he stated that AR's "flat affect" and her "demeanor" were consistent with "someone who has been abused." (SR 93).

Petitioner also argued that the prosecutor "disparaged the defense" by accusing the petitioner of "concocting a defense designed solely around the planting of semen," and stating that petitioner "would have you believe that there is a vast conspiracy . . . to incriminate him . . . by children he initially assisted, by an experienced professional police investigator, burglary victims, scientists and the phone company." (SR 94). Petitioner argued that these statements mischaracterized the evidence, disparaged the defense, made inflammatory statements, and vouched for witnesses.

Petitioner claimed that the prosecutor violated *Brady* on two occasions. (SR 95). Petitioner argued that prosecution witness BR had been accused of sexually abusing a

four-year-old child, but the relevant documents were not provided to the defense until mid-way through BR's cross-examination. (SR 95). The second *Brady* violation allegedly occurred when the prosecution failed to provide the defense with information regarding a man who had also allegedly been charged with sexually abusing AR. (SR 95-96). Petitioner argued that this "material was not provided until the defense was presenting its case, and should have been provided pre-trial.

### 1. Prosecutor's Comments

Petitioner has misapprehended the prosecutor's comment regarding the petitioner's wife's affidavit, during voir dire, prior to the affidavit's admission. The "obviously inaccurate" information related to the essentially typographical error made by the petitioner's former attorney,[20] who prepared an affidavit in which it appeared that Ms. DeFreitas was giving the sperm sample. The prosecutor was merely pointing out that such a statement would be "obviously" inaccurate. During the voir dire, the prosecutor asked whether Ms. DeFreitas reviewed and swore to the truth of the affidavit. (T. 3619). The following exchange took place:

> Q. Okay. It says Investigator Bird indicated that if I provide the sperm sample Desmond will be cleared of these charges that's obviously not correct, that's right?
>
> A. No, I guess that's Sean Doolin that did this. I didn't do it.
>
> Q. Okay, So obviously, it wasn't your [sic] that's what I meant by obviously it was inaccurate, would you agree?

---

[20] Ms. DeFreitas testified that the affidavit about the sperm sample was prepared by Sean Doolin, who was her husband's former attorney. (T. 3617).

| A. | What do you mean? |
|----|-------------------|
| Q. | Can you provide a sperm sample? |
| A. | Like I said, no. |
| Q. | Okay. |
| A. | So that was Sean Doolin's mistake not mine. |

(T. 3622). The prosecutor was not accusing Ms. DeFreitas of lying. In any event, petitioner's counsel objected,[21] the court sustained the objection, and the affidavit was admitted into evidence. It is true that there was an error in the affidavit, and it was clear to the jury from the prosecutor's subsequent questions that he was referring to an "obvious" inaccuracy regarding the ability to give a sperm sample, and was not implying that the witness was lying.

None of the remarks made by the prosecutor on summation rose to the level of a constitutional violation. His[22] reference to the couple whose house was burglarized as honest, hardworking, people was not "egregious," and the reference to Investigator Bird as a "top-notch professional investigator" was in response to the petitioner's defense that Investigator Bird obtained a sperm sample from petitioner so that he could plant evidence on the sheets. Defense counsel spent quite a bit of time on his summation implying that Investigator Bird planted, and then tampered with evidence. (*See e.g.* T.

---

[21] Defense counsel objected that the accuracy inquiry went "beyond voir dire." (T. 3620). The court agreed and received the affidavit in evidence. (*Id.*)

[22] The court has referred to the prosecutors as both "he" and "she." There were two prosecutors at petitioner's trial - District Attorney James Sacket and Assistant District Attorney Susan Mallery. Much of the trial was conducted by ADA Mallery. However, the summation was given by District Attorney Sacket.

3936-43).

The prosecution's comments must be evaluated in light of the defense arguments that preceded them. *Darden*, 477 U.S. at 179. While the prosecutor may not vouch for the credibility of the government's witnesses, the prosecutor is allowed to respond to an argument that impugns the integrity of the case, and when defense counsel has attacked the prosecutor's credibility or the credibility of the government's agents, the prosecutor is allowed to reply with rebutting language "'suitable to the occasion.'" *Jones v. Artus*, No. 9:13-CV-768, 2016 WL 3248402, at *7 (N.D.N.Y. June 13, 2016) (quoting *United States v. Carr*, 424 F.3d 213, 27 (2d Cir. 2005)). In this case, the prosecutor was only responding to the serious allegations made by the petitioner against Investigator Bird.[23]

The prosecutor's comment that the petitioner was "grooming" the children to commit "unspeakable" crimes did not rise to the level of prosecutorial misconduct. While it is true that BR and SR were not involved in the sexual misconduct charges,[24]

_____

[23] In part, the prosecutor stated: "[T]he defense could have you believe this whole case was orchestrated by Investigator Bird. He tampered with evidence and planted evidence, he conspired with other witnesses and the [R] children, to frame the defendant. Ask yourself these questions: what would be his motive? Would Investigator Bird jeopardize a twenty-three years [sic] career in law enforcement, for one defendant calling into question, hundreds if not thousands of cases he worked on, during his distinguished career?" (*Id.*) The prosecutor simply pointed out that this was a question that the jurors should ask themselves. This was a fair response to petitioner's counsel's accusations.

[24] In his Appellate Division brief, petitioner argued that there was "no evidence" to support the prosecutor's statement "with respect to [SR] or [BR]." (SR at 93). Appellate counsel may have been referring to the fact that SR and BR were not involved in the petitioner's sexual crimes, but they were certainly involved in the burglary charges. The statements were made at the beginning of the prosecutor's summation, and petitioner has taken them out of context. (T. 3968). The prosecutor stated that :

> Technically, this case is about sexual assault, burglary, about endangering the welfare of a child, about petit larceny, about criminal solicitation, what this case is really about . . . is taking advantage of already abused children and further victimizing them. Using them as pawns to commit burglaries, to satisfy sexual needs. Befriending a family and then grooming the children . . . to commit unspeakable acts.

there was testimony that petitioner brought the children along when he burglarized the residence and had one of them stand lookout. Certainly the crimes committed with AR could be characterized as "unspeakable." The prosecutor was simply commenting on the evidence that was presented through the testimony of all the children. The evidence supported the prosecutor's statement, which was not egregious or unduly inflammatory.

Finally, the prosecutor referred to AR's "flat affect" as "consistent with someone who has been abused." The petitioner argues that the prosecutor was "testifying" as an expert. However, the prosecutor actually said: "I also submit to you that [AR's] flat effect [sic] her demeanor, is consistent with someone who has been abused." (T. 3979). This statement was in the midst of a discussion rebutting the defense counsel's summation that the children were not testifying truthfully because there were many inconsistencies in their testimony. The prosecutor began this section of his summation by discussing why the children might not have known the exact date that something occurred or why they remembered some "details" and not others. (T. 3978-81). Even if the prosecutor's single statement regarding AR's demeanor could have appeared as if he were stating an "expert" opinion, it did not rise to the level of a constitutional violation. In addition, the prosecutor began his summation by telling the jury that "what the lawyers say even what the court says, it's not evidence, evidence comes from there, the witness stand. It comes from the exhibits entered into evidence . . . ." (T.

---

(*Id.*) Petitioner's counsel was incorrect when he argued that there was no evidence to support the prosecutor's statement. He was clearly speaking about the entire case, not just the sexual conduct between petitioner and AR. Then counsel told the jury that it was their recollection and the official transcript that controlled. (*Id.*) This was followed by the following statement: "if you want to know what any witness says don't take my word for it, don't take anyone's word for it, you can have that person's testimony read back to you . . . ."

3965).  In the context of the both the defense counsel's and the prosecutor's summations, the random comment about AR's demeanor did not have an injurious effect on the jury's verdict, and the Appellate Division did not act contrary to or unreasonably apply *Darden* or any other Supreme Court precedent in summarily rejecting this part of the prosecutorial misconduct claim.

## 2.    *Brady* Material

Although petitioner argues that the prosecutor withheld *Brady* material, in both instances, defense counsel received the information in time to use the material during cross-examination of the relevant witness.  With respect to the material involving accusations of sexual misconduct by BR, counsel was aware of the situation, but apparently not the details.[25]  During BR's cross-examination, there was a lengthy discussion about whether such evidence was even admissible. (T. 1395-96).  The trial judge only allowed defense counsel to ask generally whether there were "certain accusations" that were "very embarrassing."[26] (T. 1406).

The Second Circuit has held that there may be some instances in which disclosure on the eve of, or during, trial would rise to the level of a constitutional

---

[25] In fact, on direct appeal, petitioner argued that "[t]he prosecution did provide the defense with a copy of [BR's] statement to Inv. Bird, but this did not occur until the middle of [BR's] cross-examination.  This material should have been provided as soon as the prosecution was aware of its existence." (SR 95).  Apparently petitioner argued that the statement showed that BR was involved in abusing the other child and lying about the incident.  However, defense counsel was able to use the statement to the extent that the court allowed him to inquire.  The ruling would have been the same no matter how early the defense became aware of the specific statement.  In any event, defense conceded that he spoke to the child's mother.  She told counsel that she had reported the incident to the police, and that her son had been interviewed by various individuals, including Investigator Bird.

[26] In fact, BR had testified to this incident at the Grand Jury, and defense counsel had interviewed the mother of the alleged victim.

violation if the disclosure came too late to enable the defendant to use it effectively in his own defense, "'particularly if it were to open the door to witnesses or documents requiring time to be marshaled and presented.'" *Lake v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001) (quoting *United States v. Cobb*, 271 F. Supp. 159, 163 (S.D.N.Y. 1967)). Even assuming that the material were *Brady* material, as long as the defendant has the material in time for its effective use, the state has not deprived the defendant of due process simply because it did not produce the evidence sooner. *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001). In this case, petitioner's counsel received the information in time to argue that it should be used, and the court excluded some of the information in any event.

The second alleged *Brady* violation was the prosecution's withholding the fact that AR had allegedly been abused by another individual. This alleged incident does not appear to have any relevance to AR's credibility or to petitioner's case. Petitioner claims that the information was not provided until the defense was presenting its case. Petitioner does not explain the relevance of the information or how it would have had any exculpatory or impeachment value. There is no allegation that AR identified the incorrect individual or that the other individual abused AR instead of the petitioner. Thus, this information did not even rise to the level of *Brady* material, let alone cause any prejudice to petitioner's case. Thus, the Appellate Division did not act contrary to well-established Supreme Court precedent in rejecting petitioner's prosecutorial misconduct claim in its entirety.

## V.     Right to Present a Defense

### A.     Legal Standards

The Supreme Court has held that a criminal defendant has a Sixth Amendment right to a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, this right is not unlimited, and is subject to reasonable restrictions which are found in state and federal rules of procedure, "'designed to assure both fairness and reliability in the ascertainment of guilt or innocence.'" *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). It is well-settled that the court has the power to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability. *Id.* (citing *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). This includes restricting cross-examination that is harassing, prejudicial, would confuse the issues, would compromise a witness's safety, was repetitive, or was marginally relevant. *See also Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (in the context of the Confrontation Clause).

### B.     Application

Petitioner argues that his right to present a defense was impaired when the trial court prevented him from calling Peggy (Margaret) Yetman and her daughter Dorothy to testify that Investigator Bird tried to coerce Dorothy into accusing petitioner of raping her. Investigator Bird testified on cross-examination that he interviewed Dorothy as to whether she had sex with petitioner, and mentioned that she could be pregnant or have AIDS, but denied that he yelled, pounded on the table, or otherwise

36

attempted to coerce her into a false accusation. The court allowed an offer of proof, but after oral argument on the issue by both parties, the court precluded Dorothy's testimony. (T. 2170-77). Petitioner also sought to obtain testimony from the child's mother, to elicit testimony that when Investigator Bird's alleged intimidation failed, the caseworker who had been present for the interview attempted to employ similar tactics with the child's mother. (T. 2189-98). The court precluded the testimony based on the rule that on cross-examination, the examiner is bound by the witness's answer on collateral matters that are solely related to the witness's credibility.[27] (T. 2176).

The Appellate Division did not act contrary to Supreme Court precedent in finding that the exclusion of the Yetmans' testimony regarding the particular issue was proper. Investigator Bird was asked on cross-examination whether he threatened Dorothy and pounded on the table. He denied doing so. In any event, it is clear that Dorothy and her mother's testimony was directed only to Investigator Bird's credibility on a matter that had nothing to do with this case, even though defense counsel argued strenuously that it did. It was clear from cross-examination of Investigator Bird, that he did ask whether Dorothy ever had sex with petitioner, the only issue was how loud or forcefully he asked his questions. Counsel was attempting to show that if Investigator Bird attempted to obtain an accusation from Dorothy, he also attempted, and did obtain, accusations from AR. However, there was no testimony that Investigator Bird

---

[27] Generally, in a habeas proceeding, an erroneous evidentiary ruling does not rise to the level of a constitutional violation unless "'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Allen v. State of New York*, No. 13-CV-991, 2016 WL 5928817, at *15 (W.D.N.Y. Oct. 12, 2016) (quoting *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (alteration in original)).

threatened or attempted to force statements out of the complaining witnesses in this case. Introducing such testimony would not have created a reasonable doubt that otherwise did not exist.

The court also limited counsel's direct examination of Kerrianne Dahlberg. (T. 2824-31). The court did not allow defense counsel to question Ms. Dahlberg about the telephone call that she allegedly received from Ms. DeFreitas, during which Ms. DeFreitas asked whether Investigator Bird was doing the right thing by asking petitioner for a sperm sample. The prosecutor objected the testimony as hearsay, and the court agreed, notwithstanding the defense attorney's argument. The court precluded any discussion of the details of the alleged conversation. (T. 2830).

Petitioner raised this claim on direct appeal, and the Appellate Division considered it on the merits, finding that the court's restrictions were "reasonable" and did not impair petitioner's right to present a defense. Thus, the AEDPA standard applies to the Appellate Division's decision.

The Appellate Division did not act contrary to well-established Supreme Court precedent in making the above ruling. Ms. Dahlberg was going to testify that Ms. DeFreitas called her to inquire whether Investigator Bird should be asking petitioner to produce a sperm sample, and Ms. Dahlberg said "no," and advised Ms. DeFreitas to contact an attorney. (T. 226-28) (offer of proof - jury absent). This testimony was clearly hearsay, and the court found that there were no exceptions applicable. Ms. Dahlberg was allowed to testify that she received a telephone call from petitioner's wife, and that the subject of the call was Investigator Bird. (T. 2831). Petitioner's wife

had already testified that she called to ask Ms. Dahlberg about giving the sperm sample, so the jury already knew the subject of the telephone call and why it was made. Thus, there was no damage to petitioner's defense when the court would not allow Ms. Dahlberg to elaborate on what was said during the call itself.[28]

Finally, petitioner claims that his right to present a defense was violated when he was not allowed to question SR about allegedly having falsely accused someone of sexual abuse. On cross-examination, defense counsel asked SR if "at one time you went down to the principal's office and claimed that Calvin Mann sexually assaulted you?" (T. 1003). The prosecutor objected based on relevance. (*Id.*) The jury was excused, and the court heard legal argument from counsel. (T. 1003-1005). The court ultimately allowed defense counsel to ask whether SR made a false accusation against Calvin Mann and reported it to the principal. (T. 1005). However, the court sustained the prosecutor's objection when defense counsel asked SR what she would say if Calvin Mann came into court and testified to the contrary. (T. 1005-1006). The jury was excused a second time and the prosecutor argued that any testimony by Calvin Mann would be "collateral," and that if SR denied making the accusation, defense counsel was bound by that answer and would not be allowed to bring another witness in to say that SR testified falsely. (T. 1006-1007).

First, the court's ruling was correct. The judge reminded defense counsel of the collateral evidence rule, and noted that defense counsel would not be able to call Calvin Mann as a witness to testify that SR testified falsely. (*Id.*) Under New York law, the

---

[28] The Appellate Division also found that, to the extent that the record revealed "some" impropriety, the error was harmless in view of the overwhelming evidence of the petitioner's guilt.

"collateral evidence rule" bars a party from introducing extrinsic evidence on a collateral matter solely to impeach credibility." *Alford v. Lempke*, No. 9:11-CV-1316, 2014 WL 7888884, at *15 (N.D.N.Y. Feb. 25, 2014) (quoting *People v. Alvino*, 71 N.Y.2d 233, 247-48 (1987)). In any event, the jury was allowed to hear the defendant's implication that SR may have made a false claim of sexual assault against another individual. However, as respondent points out, SR did not accuse the petitioner of sexually assaulting her. What SR did or did not do with respect to Calvin Mann was collateral to the case in which she was testifying. The Appellate Division did not act contrary to Supreme court precedent in denying the petitioner's claim.

## VI.   **Ineffective Assistance of Appellate Counsel**

### A.   **Legal Standards**

The general standard for ineffective assistance of counsel, articulated by the Supreme Court in *Strickland v. Washington*, applies to both trial and appellate counsel. *McKee v. United States*, 167 F.3d 103, 106 (2d Cir.1999) (*Strickland* standard also applies to effectiveness of appellate counsel). While a defendant has the right to effective counsel on appeal, *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985), in the appellate context, counsel is not required to advance every non-frivolous argument that could be made. *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts*, 469 U.S. at 394. *See also Jones v. Barnes*, 463 U.S. 745, 75 (1983)). "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (citing *Mayo v. Henderson*,

13 F.3d 528, 533 (2d Cir. 1994)).

### B. Application

Petitioner raised his ineffective assistance of appellate counsel claim in his application to the Appellate Division for coram nobis relief, which  the proper way to exhaust a claim of ineffective assistance of appellate counsel. *See People v. Bachert*, 69 N.Y.2d 593, 598, 516 N.Y.S.2d 623, 626 (N.Y. 1987) (In New York, a common law writ of error coram nobis, filed in the appellate court, is the proper vehicle for bringing a claim of ineffective assistance of appellate counsel); *Turner v. Miller*, 124 F. App'x 682, 683-84 (2d Cir. 2005) (same).  The Appellate Division denied petitioner's claim on the merits in a summary order, and therefore, the deferential AEDPA standard applies. *Harrington v. Richter, supra.*

Petitioner claims that appellate counsel was ineffective because he failed to argue that (1) trial counsel was ineffective for failing to develop the record regarding the relationship between two jurors and the District Attorney's office; (2) failing to object to allegedly improper comments by the prosecutor during summation; (3) failing to demand that the prosecutor turn over information regarding any immunity afforded to AR and BR for their testimony against petitioner; and was ineffective when he (4) failed to challenge the trial court's ruling which denied petitioner "for cause" challenges to the three jurors discussed above.

### 1. Jurors

None of the grounds that petitioner now suggests that appellate counsel should have raised were "significant and obvious" issues omitted by appellate counsel in favor

of "clearly and significantly weaker" claims. Appellate counsel's brief was 90 pages long. (SR 1-97). Counsel did challenge the trial court's ruling on the for-cause challenges to the three jurors discussed above as well as claiming that the court should have inquired further into the nature of the relationships between the prospective jurors and the District Attorneys Office. (SR 69-76). Trial counsel argued very forcefully during voir dire that these jurors should be excluded for cause. Appellate counsel had no reason to claim that trial counsel was ineffective because the court denied counsel's request.

Appellate counsel also raised the issue of prosecutorial misconduct. Based on this court's discussion above regarding prosecutorial misconduct, and the fact that the Appellate Division decided the prosecutorial misconduct claims on the merits regardless of trial counsel's failure to object, there was no prejudice to petitioner.

With respect to petitioner's speculation regarding "immunity," there is no indication in the record regarding immunity for the children. Petitioner speculates that because the children were not "prosecuted" for their involvement in the burglary, they must have been afforded "immunity" for their testimony. (Pet. Mem. of Law at 20-21). Petitioner claims that the prosecutor should have turned over this "deal." (*Id.*) There is no evidence of a "deal" in the record, and appellate counsel's failure to raise this claim does not rise to the level of ineffective assistance.

Instead, appellate counsel raised most of the substantive claims that petitioner now alleges should have been raised in the context of ineffective assistance of trial counsel. In addition, appellate counsel raised a claim that was successful on appeal.

He successfully argued that the second degree burglary conviction should be reduced to third degree burglary based on insufficiency of evidence. Thus, based on this court's discussion of the merits of petitioner's arguments, and appellate counsel's successful claim of insufficiency, appellate counsel was not raising weaker issues while omitting clearly stronger issues. Petitioner's appellate counsel claim may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is

**RECOMMENDED**, that a certificate of appealability be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: May 3, 2017

Hon. Andrew T. Baxter
U.S. Magistrate Judge